UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JESSE P.,

                Plaintiff,

        -v-                    5:20-CV-1361

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                  OF COUNSEL:

OLINSKY LAW GROUP      HOWARD D. OLINSKY, ESQ.
Attorneys for Plaintiff
250 South Clinton Street, Suite 210
Syracuse, NY 13202

SOCIAL SECURITY         MICHAEL L. HENRY, ESQ.
   ADMINISTRATION       Special Ass't U.S. Attorney
Attorneys for Defendant
J.F.K. Federal Building, Room 625
15 New Sudbury Street
Boston, MA 02203

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION & ORDER

## I. INTRODUCTION

On November 4, 2020, plaintiff Jesse P.[1] ("plaintiff" or "claimant") filed this action seeking review of the final decision of defendant Commissioner of Social Security ("Commissioner" or "defendant") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act").  The Commissioner has filed a certified copy of the Administrative Record and both parties have briefed the matter in accordance with General Order 18, which provides that an appeal taken from a final decision denying benefits will be treated as if the parties have filed cross-motions for a judgment on the pleadings.  *See* FED. R. CIV. P. 12(c).  Plaintiff's appeal will be considered on the basis of these submissions without oral argument.

## II. BACKGROUND

On April 24, 2017, plaintiff applied for DIB alleging that his diabetes, arthritis, and limited use of his right arm had rendered him disabled beginning on January 5, 2017.  R. at 149–52.[2]  Plaintiff's claim was initially denied on August 24, 2017.  *Id*. at 64–80.

---

[1]  In accordance with a May 1, 2018 memorandum issued by the Judicial Conference's Committee on Court Administration and Case Management and adopted as local practice in this District, only claimant's first name and last initial will be mentioned in this opinion.

[2]  Citations to "R." refer to the Administrative Record.  Dkt. No. 13.

On January 31, 2019, at plaintiff's request, a hearing was held before Administrative Law Judge ("ALJ") Gretchen Greisler.  R. at 33–63.  The ALJ conducted the hearing from Syracuse, New York.  *Id*.  Plaintiff appeared and testified.[3]  *Id*.  After the hearing, Vocational Expert Esperanza DiStefano submitted responses to a set of vocational interrogatories.  *Id*. at 223–34.

On August 6, 2019, ALJ Greisler issued a written decision denying plaintiff's application for benefits.  R. at 11–25.  This became the final decision of the Commissioner on September 3, 2020, when the Appeals Council denied plaintiff's request for review.  *Id*. at 1–3.

## III.  LEGAL STANDARD

The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

To qualify as disabled within the meaning of this definition, the Act requires that a claimant's:

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other

---

[3]  Although the ALJ explained to plaintiff that he had a right to representation, he elected to proceed with the hearing without the benefit of counsel.  R. at 33–34.  Plaintiff has since retained an attorney for the purpose of this appeal.

kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

The ALJ follows a five-step sequential evaluation process to decide whether a claimant is disabled.  20 C.F.R. § 404.1520.[4]  At step one, the ALJ determines whether the claimant is currently engaged in "substantial gainful activity."  § 404.1520(a)(4)(i).  If so, the claimant is not disabled regardless of his medical condition or other factors.  § 404.1520(b).

If the claimant is not engaged in substantial gainful activity, then step two requires the ALJ to determine whether the claimant has a "severe" impairment or combination of impairments; *i.e.*, a medically determinable condition that "significantly limits" his physical or mental ability to do basic work activities.  § 404.1520(c).

If the claimant suffers from a severe impairment or combination of impairments, then step three requires the ALJ to determine whether the impairment(s) meet or equal an impairment specifically listed in Appendix 1 of the Regulations (the "Listings").  § 404.1520(d).  If the claimant's severe

---

[4]  Section 404.1520 sets forth the five-step evaluation used for DIB claims.  A parallel set of regulations govern SSI applications.  *See* 20 C.F.R. § 416.920(a)(4).

impairment(s) meet or equal one or more of the Listings, then the claimant is presumed to be disabled regardless of any other factors. § 404.1520(a)(4)(iii).

If the claimant is not presumed disabled under one or more of the Listings, then step four requires the ALJ to assess whether—despite the claimant's severe impairment(s)—he has the residual functional capacity ("RFC") to perform his "past relevant work." § 404.1520(e)–(f). If so, the claimant is not disabled. § 404.1520(a)(4)(iv).

Finally, if the claimant cannot perform his past relevant work, the Commissioner must determine if the claimant's RFC, in combination with his age, education, and work experience, permits the claimant to do any other work in the national economy. § 404.1520(a)(4)(v), (f)–(g).

The burden of proof for the first four steps is on the claimant. *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996). However, if the claimant shows he cannot perform his past relevant work at step four, the burden shifts to the Commissioner for step five. *Id.*

The Act further provides for judicial review of "any final decision . . . made after a hearing" by the Social Security Administration ("SSA" or the "Agency"). 42 U.S.C. § 405(g). However, the scope of this review is limited to determining whether (1) the Commissioner applied the correct legal standard to his analysis and, if so, (2) whether the final decision is supported by

"substantial evidence." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (cleaned up).

"Substantial evidence means more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (cleaned up).  "If the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." *Morales v. Berryhill*, 484 F. Supp. 3d 130, 140 (S.D.N.Y. 2020) (citation omitted).

However, this "deferential standard of review for substantial evidence does not apply to the Commissioner's conclusions of law." *Byam v. Barnhart*, 336 F.3d 172, 179 (2d Cir. 2003).  Thus, "where there is a reasonable basis for doubting whether the Commissioner applied the appropriate legal standards," the decision should not be affirmed.  *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).  This is so regardless of whether or not the decision is otherwise supported by "substantial evidence."  *See id*.

## IV.  <u>DISCUSSION</u>

The ALJ applied the five-step analysis to find that: (1) plaintiff had not engaged in substantial gainful activity since January 5, 2017, the alleged onset date; (2) plaintiff's right shoulder pain, bursitis and adhesive capsulitis status-post surgery, left shoulder adhesive capsulitis, diabetes mellitus,

cervical spine disorder, peripheral neuropathy, and amputation of multiple toes were "severe" impairments within the meaning of the Regulations; and (3) these impairments, whether considered individually or in combination, did not meet or equal any of the Listings.  R. at 14–15.

At step four, the ALJ determined that plaintiff retained the RFC perform "sedentary work" with a set of exertional limitations.  Specifically, the ALJ found that:

> the claimant can walk for up to one hour per day and can stand for up to one hour per day.  The claimant requires a brief, one to two minute change in position after sitting for thirty minutes or standing or walking for ten minutes but retains the ability to remain on task.  The claimant can occasionally stoop, balance, crouch, crawl, kneel and climb stairs and ramps but cannot climb ladders, ropes or scaffolds or work at unprotected heights or in close proximity to dangerous machinery.  The claimant can occasionally reach overhead and can frequently reach in all other directions but cannot use foot controls.

R. at 15–16.

Next, the ALJ determined that plaintiff had past relevant work as an industrial x-ray technician, but that he was unable to perform this past work with his current RFC.  R. at 24.  However, after considering plaintiff's age, education, and the RFC finding in light of the interrogatory responses she received from the Vocational Expert, the ALJ concluded that plaintiff could

still perform a range of sedentary work in representative jobs as a "document preparer," a "call out operator," or a "table worker." *Id.* at 25.

Because these representative jobs existed in the sufficient numbers in the national economy, the ALJ concluded that plaintiff was not disabled between January 5, 2017, the alleged onset date, through August 6, 2019, the date of her written decision. R. at 25. Accordingly, the ALJ denied plaintiff's application for benefits. *Id.*

## A. **Plaintiff's Appeal**

Plaintiff contends that the ALJ's RFC determination is not supported by substantial evidence because she failed to properly evaluate the medical opinion offered by Stephanie Hook, plaintiff's treating podiatrist. Pl.'s Mem., Dkt. No. 18 at 20.[5]

"Where, as here, the ALJ finds at step two that a claimant has one or more 'severe' impairments but determines at step three that the claimant is not presumptively disabled, the ALJ must go on to make an RFC finding, which is an assessment of 'what an individual can still do despite his or her limitations.'" *Amanda R. v. Comm'r of Soc. Sec.*, 556 F. Supp. 3d 145, 153 (N.D.N.Y. 2021) (quoting *Tammy Lynn B. v. Comm'r of Soc. Sec.*, 382 F. Supp. 3d 184, 192 (N.D.N.Y. 2019)).

---

[5] Pagination corresponds with CM/ECF.

"The claimant's RFC is determined based on all of the relevant medical and other evidence in the record, including the claimant's credible testimony, objective medical evidence, and medical opinions from treating and consulting sources." *Amanda R.*, 556 F. Supp. 3d at 153 (quoting *Rivera v. Comm'r of Soc. Sec.*, 368 F. Supp. 3d 626, 640 (S.D.N.Y. 2019)). "In practice, administrative law judges rely principally on medical source opinion and subjective testimony when assessing impaired individuals' ability to engage in work-related activities." *Id.* (quoting *Tammy Lynn B. v. Comm'r of Soc. Sec.*, 382 F. Supp. 3d 184, 192–93 (N.D.N.Y. 2019)).

Historically, the Regulations divided the opinion evidence from a claimant's medical sources into three discrete categories: (1) treating; (2) acceptable; and (3) other. *Amanda R.*, 556 F. Supp. 3d at 153. Under this hierarchical approach, an opinion from a "treating" source enjoyed top billing: it received *controlling* weight as long as it was "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and was "not inconsistent with the other substantial evidence in [the] record." *Id.*

This special consideration given to a medical opinion rendered by a claimant's treating source actually began life as a judicial innovation. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 829 (2003) ("The treating physician rule at issue here was originally developed by Courts of Appeals as

a means to control disability determinations by administrative law judges under the Social Security Act[.]").

However, thanks at least in part to a long-running class action suit initially brought in the Western District of New York, the SSA eventually sought to regain a measure of uniformity and control over the way medical opinion evidence was analyzed by its ALJs and reviewed by the courts. *See, e.g.*, *Schisler v. Sullivan*, 3 F.3d 563, 565 (2d Cir. 1993) (explaining the historical lack of "comprehensive administrative regulations concerning the weighing of [treating physician] opinions").

In the early 1990s, the Agency exercised its statutory authority to codify a slightly modified version of this so-called "treating physician rule." *Schisler*, 3 F.3d at 566; *see also Dany Z. v. Saul*, 531 F. Supp. 3d 871, 888 (D. Vt. 2021) (explaining the litigation in the Second Circuit that ultimately led to the codification of the rule).

Even so, the correct application of this "rule" continued to be an outsized focus of litigation in the federal courts. A claimant's treating provider would opine, in sum and substance, that their patient was severely impaired while other medical evidence—such as reports from consulting examiners or agency doctors tasked who reviewed the record—would undermine or even contradict the treating physician's findings. If the ALJ dared to discount the former by

relying on the latter, the claimant would accuse the ALJ of violating the Agency's special "rule" about treating physicians.

Eventually, the SSA came to believe that the whole idea of a "treating physician rule" caused more confusion than it was worth.  As part of a wholesale revision to the way in which it evaluates medical evidence in disability claims, the Agency proposed to eliminate the "treating physician rule."  *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 81 Fed. Reg. 62,560 (proposed Sept. 9, 2016) (to be codified at 20 C.F.R. pts. 404, 416).

As part of its justification for the changes, the SSA opined that the rule often led reviewing courts to misapply the substantial evidence standard, which is ordinarily supposed to be pretty deferential to administrative determinations.  *See, e.g.*, Charles Terranova, Comment, *Somebody Call My Doctor: Repeal of the Treating Physician Rule in Social Security Disability Adjudication*, 68 BUFF. L. REV. 931, 957 (2020) (discussing the Agency's rational and identifying the ongoing "tension between the federal court's application of the treating physician rule and the [SSA's] interest in [the] independent and efficient administration of its programs").

Thus, on January 18, 2017, as part of a complete revision to its Regulations on medical opinion evidence, the SSA eliminated the treating physician rule.  *See, e.g.*, *Dany Z.*, 531 F. Supp. 3d at 882 (rejecting challenge

to the validity of the revised set of Regulations). Under the new rules, "no particular deference or special weight is given to the opinion of a treating physician." *Amanda R.*, 556 F. Supp. 3d at 154 (citation omitted).

Instead, an ALJ is obligated to evaluate the persuasiveness of "all of the medical opinions" based on the same general set of criteria: (1) supportability; (2) consistency with other evidence; (3) the source's relationship[6] with the claimant; (4) the source's area of specialization; and (5) other relevant case-specific factors "that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. §§ 404.1520c(c)(1)–(5), 415.920c(c)(1)–(5).

The most important of this revised set of factors are supportability and consistency. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). And although the Regulations obligate the ALJ to explain how he or she considered these two specific factors, "an explanation for the remaining factors is not required unless the ALJ is deciding among multiple medical opinions of equal support and consistency on the same issue that differ slightly." *Amanda R.*, 556 F. Supp. 3d at 154 (quoting *Dany Z.*, 531 F. Supp. 3d at 882).

Because plaintiff filed his DIB claim on April 19, 2017, the new rules apply. Notably, however, these new Regulations do not amount to much of a

---

[6] This "relationship" factor includes (i) the length of the treating relationship; (ii) the frequency of examination; (iii) the purpose of the treating relationship; (iv) the extent of the treating relationship; and (v) whether the source examined the claimant. 20 C.F.R. §§ 404.1520c(c)(3)(i)–(v).

practical change in terms of the analysis itself.  As Judge Baxter recently

explained:

> Consistency and supportability were as important under the previous regulations as they are in the new regulations because "consistency" with evidence in the record was always considered when determining whether "controlling" weight was going to be given to a treating physician's opinion, before any of the other factors were considered. The new regulations restate the factors which have always been used in considering any medical opinion. A treating physician's opinion may still be more persuasive because he or she will have examined the plaintiff more frequently and will presumably have a more substantial relationship with the patient. Thus, although there is no "special" deference given, the treating relationship is one of the factors to be considered in the analysis under the new regulations.

*Amanda R.*, 556 F. Supp. 3d at 154 –55 (quoting *Harry B. v. Comm'r of Soc.*

*Sec.*, 2021 WL 1198283, at *10 (N.D.N.Y. Mar. 30, 2021) (Baxter, M.J.)).

In other words, although "ALJs are no longer directed to afford controlling

weight to treating source opinions—no matter how well supported and

consistent with the record they may be—the regulations still recognize the

'foundational nature' of the observations of treating sources, and 'consistency

with those observations is a factor in determining the value of any [treating

source's] opinion." *Amanda R.*, 556 F. Supp. 3d at 155 (quoting *Shawn H. v.*

*Comm'r of Soc. Sec.*, 2020 WL 3969879, at *6 (D. Vt. July 14, 2020)).

The central issue in this appeal is the ALJ's treatment of medical opinion evidence offered by Stephanie Hook, D.P.M., plaintiff's treating podiatrist.  As relevant here, plaintiff was diagnosed with diabetes mellitus Type 2 "that started 20 years ago."  R. at 483; *see also, e.g.*, *id*. at 678.  Type 2 diabetes, "previously known as adult-onset [diabetes] or non-insulin-dependent [diabetes]," is a medical condition in which "the pancreas does not produce enough insulin, or there is failure in the transfer of insulin into the body cells (insulin resistance)."  SSR 14-2p at I.B.2.

Symptoms of Type 2 diabetes include "cuts or bruises that are slow to heal, numbness in the hands and feet, or recurrent infections of the skin, gums, or bladder."  SSR 14-2p at I.B.2.  "Amputation and foot ulceration are common consequences of [peripheral arterial disease]," a type of medical complication attributable to diabetes mellitus.  *Id*.

The medical evidence shows plaintiff has undergone multiple amputations to remove toes with ulcerations that were not healing.  R. at 20.  Plaintiff's right big toe was amputated on June 22, 2015.  *Id*. at 315.  Plaintiff's right fourth toe was amputated on August 1, 2016.  *Id*. at 250.  Plaintiff's right second toe and left third toe distal were amputated on December 29, 2016.  *Id*. at 293.  Plaintiff's left fourth toe was amputated on November 2, 2017.  *Id*. at 762.  And plaintiff's right third toe distal was amputated on August 2, 2018.  *Id*. at 759.

These amputations were performed by Dr. Hook, who has been plaintiff's treating podiatrist since January of 2009.  R. at 504.  Plaintiff treats with Dr. Hook about once a month on average.  *Id*.  The ALJ discussed plaintiff's treatment with Dr. Hook and in particular made findings about two of Dr. Hook's opinions that are contested in this appeal.

First, shortly after treating plaintiff for a blister on his foot on April 13, 2017, Dr. Hook opined that in her treatment notes that:

> I think he will recover from this very nicely.  Over the years, I have seen him recover from things much worse than this . . . . I advised him on home care of this including applying Betadine and a powdered daily.  He continues out of work secondary to shoulder issues.  He also asks a little bit about going ahead with disability, and I let him know that, with what I have seen on his feet over the years, <u>I feel that continued working for him will only lead to further amputations.</u>

R. at 283 (emphasis added).

The ALJ found that this opinion, at least to the extent it "related to the claimant being able to continue working," was "not persuasive" because "[t]he evidence does not support that any work will result in further foot issues and Dr. Hook does not explain why working would cause such issues."  R. at 22.  In the ALJ's view, because "Dr. Hook was not precise as to what type of work she was referring to," her broad conclusion that any type of work activity would lead to further amputations was "speculative."  *Id*.

Second, on January 14, 2019, Dr. Hook completed a "diabetes impairment questionnaire." *Id*. at 504–08.[7] There, Dr. Hook opined that plaintiff's prognosis was "fair as far as his feet" even though he has a "history of repeated cellulitis and necessitated amputations" and suffers from a "loss of sensation causing pressure points leading to repeated breakdown and infection." *Id*.

In this questionnaire, Dr. Hook also opined that plaintiff can work in a seated position for four hours in an eight-hour workday, can stand and/or walk for less than an hour in an eight-hour workday, and can lift and carry 0–10 pounds frequently and up to 10–20 pounds occasionally. R. at 506.

Dr. Hook further opined that it was "medically necessary" for plaintiff to avoid continuous sitting during an eight-hour workday, and that he must elevate both of his legs to waist level whenever he is sitting. R. at 507. Dr. Hook also stated that plaintiff would need to get up and move around about once every hour for about ten minutes before he could resume a sitting position. *Id*.

---

[7] This document is dated January 14, 2019. R. at 504–508. However, plaintiff refers to it as a "January 14, 2018" document. Pl.'s Mem. at 21. The Commissioner follows plaintiff's lead. Def.'s Mem., Dkt. No. 23 at 16 (referring to "January 2018 Diabetes Impairment Questionnaire"). And the ALJ refers to it as an "April 13, 2017" questionnaire, which is actually the date of her earlier treatment note about continued work leading to further amputations. R. at 22. After comparing the record citations from plaintiff, the Commissioner, and the ALJ, it is apparent that all three parties are referring to the same January 14, 2019 questionnaire found in the Administrative Record at pages 504 to 508.

Finally, Dr. Hook opined that plaintiff would occasionally experience pain, fatigue, or other symptoms that were severe enough to interfere his attention and concentration and that, as a result of his impairments, he would miss work about once a month.  R. at 508.

The ALJ found this January 2019 opinion "only partially persuasive."  R. at 22.  In doing so, the ALJ acknowledged that Dr. Hook "is an acceptable medical source who routinely treats the claimant for diabetic foot issues."  *Id*. Even so, the ALJ reasoned that "[t]he complete record of medical evidence does not support the frequent necessity to change positions and the estimate of being absent once a month is speculative."  *Id*.

Plaintiff argues that the ALJ's decision to (1) discount Dr. Hook's April 2017 opinion about continued work leading to further complications and (2) partially discount Dr. Hook's January 2019 opinion about changing positions and being absent once a month "is not supported by the Regulations or the law of this Circuit."  Pl.'s Mem. at 21.

In plaintiff's view, Dr. Hook's restrictive opinions are consistent with the entirety of the medical record, including the treatment notes and opinion of Nathan Keever, D.O., plaintiff's primary care provider.  Pl.'s Mem. at 23.  As plaintiff explains, both Dr. Keever's opinion and the "objective, clinical findings" show that his feet continued to worsen over time.  *Id*. at 23–24.

According to plaintiff, the ALJ failed to "engage with the entirety of the record" when rejecting the portions of Dr. Hook's opinion about certain functional limitations, such as the length of time in which he could sit or that he would need to keep his feet elevated.  Pl.'s Mem. at 24–26.

Upon review, these arguments must be rejected.  As an initial matter, the Commissioner correctly points out that Dr. Hook's April 2017 statement about the likely consequences of continued work—at least to the extent that her statement could be characterized as a tacit recommendation that plaintiff stop working or that continued work activity was somehow impossible at any exertional level—is not actually considered a "medical opinion" under either the old or the new Regulations.  Def.'s Mem. at 16.

Indeed, courts have regularly held that an ALJ can reject this kind of opinion statement from a treating source because it treads on the ultimate question of disability under the Act, which is an issue explicitly reserved for the Commissioner.  *See, e.g.*, *Nora A. v. Comm'r of Soc. Sec.*, 551 F. Supp. 3d 85, 93 (W.D.N.Y. 2021) (rejecting plaintiff's assertion that ALJ improperly rejected treating source's opinion that "Plaintiff was unable to sustain meaningful work").

Likewise, the ALJ properly considered the responses given by Dr. Hook on the January 2019 Diabetes Impairment Questionnaire.  Under either version of the Regulations, "[t]here is no requirement that the ALJ pick one RFC and

use that particular evaluation in its entirety.  Rather, it is the ALJ's responsibility to choose between properly submitted medical opinions and other competent evidence to piece together an overall RFC assessment." *Samantha S.*, 385 F. Supp. 3d at 185 (cleaned up).

The ALJ discharged that responsibility in this case, contrasting Dr. Hook's highly restrictive opinions with several other medical opinions in the record, including one from Dr. Keever, plaintiff's primary care provider.  As the Commissioner notes, the RFC assessment that the ALJ ultimately settled on is actually somewhat close to the set of functional limitations assessed by Dr. Keever.  Def.'s Mem. at 12–13.  The ALJ's RFC assessment also includes a position-change accommodation that is consistent with plaintiff's hearing testimony.  *Id.* at 13.  And most notably, the ALJ's RFC assessment is far *more* restrictive than the opinions offered by consultative examiner Rita Figueroa M.D., State agency medical analyst Gabriel Feldman, M.D., or medical expert Nitin Dhiman, M.D., all of whom opined that plaintiff had "no trouble sitting, standing, or walking."  Def.'s Mem. at 12–13.

Indeed, as the Commissioner points out, plaintiff's long-term treating relationship with Dr. Hook "actually shines a spotlight on a glaring problem with her opinion."  Def.'s Mem. at 17.  In her January 2019 opinion, Dr. Hook states that plaintiff's limitations have been in effect "as far back as" January of 2009.  R. at 508.  On its face, that statement of medical opinion is difficult

to reconcile with the factual reality that plaintiff continued to perform full-time, heavy-duty work as an X-ray technician from 2009 to 2017, a role in which he was required to do far more walking, standing, and lifting than Dr. Hook apparently believed possible in that time period.  *See* Def.'s Mem. at 17.

At the very least, then, the ALJ was obligated to find some way to reconcile this discrepancy in the record evidence when assessing plaintiff's RFC.  The ALJ did so by striking a reasonable balance between Dr. Hook's extremely restrictive findings (which were at least somewhat undermined by plaintiff's work activities during that period), the relatively restriction-free findings assessed by other examining and non-examining medical sources (such as Drs. Figueroa, Feldman, and Dhiman), and the supportable testimony offered by plaintiff regarding his need to shift positions.

As the Commissioner emphasizes, it may seem counterintuitive but toe amputations do not necessarily lead to disabling functional limitations.  Of course, the resulting complications from plaintiff's loss of additional toes would likely preclude him from ever returning to his past relevant work, which was performed at a heavy or very heavy exertional level.  R. at 24.

But the ALJ recognized that.  She weighed all of the conflicting evidence in the record, considered plaintiff's hearing testimony, solicited a post-hearing vocational questionnaire from a subject matter area expert, and

ultimately concluded that plaintiff could still perform a range of "sedentary" work with an allowance for position changes.

That is a reasonable conclusion to reach on this record. "Plaintiff's disagreement with the ultimate factual determinations that the ALJ drew from this record evidence is not a basis for remand." *Tammy Lynn B.*, 382 F. Supp. 3d at 195. Accordingly, this argument must be rejected.

In doing so, it bears noting that "an ALJ is only empowered to deny benefits to a claimant for a discrete time period." *Samantha S.*, 385 F. Supp. 3d at 190. For instance, in this case the ALJ only denied benefits to plaintiff during the time period between January 5, 2017, the alleged onset date, through August 6, 2019, the date of her written decision. Although plaintiff retained the RFC for sedentary work during that time period, several years have passed since the ALJ's determination.

It is possible that plaintiff can now show a further deterioration in his functional abilities, either as a result of additional amputations that are not reflected in the existing record or perhaps from the combined effect of those and other impairments. If so, a second application for benefits with a later onset date might be warranted. *See, e.g.*, *Samantha S.*, 385 F. Supp. 3d at (suggesting same where "plaintiff might be able to show a deterioration in her condition that warrants the filing of a new application").

## IV.  **CONCLUSION**

The ALJ applied the correct legal standards and supported her written

decision with substantial evidence in the record.

Therefore, it is

ORDERED that

1.  The Commissioner's motion for a judgment on the pleadings is

GRANTED;

2.  Plaintiff's motion for a judgment on the pleadings is DENIED;

3.  The Commissioner's decision is AFFIRMED; and

4.  Plaintiff's complaint is DISMISSED.

IT IS SO ORDERED.

David N. Hurd
U.S. District Judge

Dated:  June 9, 2022
        Utica, New York.